So, we're ready in the first matter, and so Council can approach the bench and state your name and appearance for the record. May it please the Court, Jerry Sinzdak, appearing on behalf of the government. I would like to reserve five minutes of my time for rebuttal. All right, we'll try. Thank you. Secretaries of Homeland Security Duke and Nielsen recently concluded that the conditions that these four countries had issued that existed at the time of their designation, some of which designations occurred as long as 20 years ago, no longer existed, and therefore terminated the determinations for those countries. That termination and those termination decisions are not reviewable under the TPS statute. The statute says in clear and sweeping terms that there is no judicial review with respect to any determination made on termination decisions. Counsel, can I ask a question? We have some very sympathetic plaintiffs here, and some of them have been in the country for 20 years or longer. They have kids here. It's going to be a great hardship, and there's some reliance interests that's been made on decisions by the government. My question is, how do we account for those reliance interests? Is that just something we look to on the balance of the equities, or can that reliance interest actually come into play in review of the merits of the case? Your Honor, those reliance interests come into play at the balance of the equities portion of the standard for granting preliminary injunctive relief. As the Supreme Court made clear in winter, each of the elements of the preliminary injunction standard must be met in order to grant preliminary relief, and we are not here contesting that plaintiffs will suffer harm and that the reliance interests and the balance of equities tips in their favor, but plaintiffs nonetheless must show that they are likely to succeed on the merits of their claims or at least raise serious questions about those claims, and they do not do so here. Can we review that decision for an abuse of discretion? Well, overall, the standard for a preliminary injunction is an abuse of discretion. However, where there's clear legal error, that is an abuse of discretion. So, as referring to the one winter factor, I think you are challenging, which is likelihood of success on the merits? That's correct, Your Honor. And you want us to review that how? Well, Your Honor, with respect to whether the judicial review bar applies, that's a pure question of law, so that is reviewed de novo effectively, and we believe the district court... That's the legal error you're referring to. That's the legal error. You want us to review de novo. Exactly. Let me just so that I understand your position. So, is it the government's position that the TPS statute bars all of the plaintiff's claim, including the constitutional challenge, or only the APA claim? Because you're challenging, obviously, you're saying that it's not reviewable or it's not justiciable. Does that only apply to the APA claim, or does it also apply to the equal protection claim? Your Honor, it's our position that it applies to both claims, that it is sweeping enough in its language and clear enough in its language to cover both constitutional and the statutory claims. And, you know... So, the government's position is that there is no review here for a constitutional claim? That is the government's position, yes, and that is the nature... I have a question on the constitutional claim. Is the constitutional claim a claim under the APA, and it gets to us, and we have jurisdiction, we'd have the ability to review that claim under the APA, or is there a separate provision that allows us to review the government action, separate and apart from the APA, for a claim of a violation of the Equal Protection Clause? No, the... Whenever a plaintiff is challenging agency action, it is governed by the APA. The APA makes quite clear that you're reviewing not only for arbitrary and capricious review, but also for a violation of constitutional right. So, therefore, if you're challenging an agency action, it would fall within... A constitutional challenge would fall within the APA and the limitations on an APA action, which include a limitation to the administrative record. Isn't your argument better as to the APA? I mean, if it's not justiciable, then I understand your argument that the APA... It's a little bit... There's a circular argument that the APA... ...couldn't confer jurisdiction, so I understand your argument of why that would take care of the APA claim, but the Equal Protection Claim's a little bit different. I mean, generally speaking, constitutional claims are always reviewable on some level, so that's pretty sweeping. I disagree in the sense that the Supreme Court has made clear, and this Court's decision in Gebhardt made this point, that if a judicial bar on judicial review is clear enough and does include constitutional claims, and in Gebhardt, the way this Court handled it, it said, you know, this bar, it appears to cover constitutional claims. It's broad enough, and it's similar to the bar here. That's the question, though, isn't it, is how clear this is? It's interesting. It's a little... I don't know if it's ironic, but it seems to me that as to the collateral aspect of the reviewability, the plaintiffs may have a stronger argument on the APA than they do on the Equal Protection Clause claim. The Equal Protection Clause claim, in my view, isn't collateral at all. On the other hand, we have case law that suggests that the statute must be more clear as to constitutional claims in order to preclude it. So how do we navigate that? If we find that the constitutional claim is not collateral, do we say that it's just unreviewable? Even though we have this other precedent that says that you want to review constitutional claims. Well, you know, even the District Court, I think, acknowledged that the constitutional claim is not collateral. But you didn't... In the District Court, didn't you go to the merits of the Equal Protection Claim? That's correct, Your Honor. And, you know, as this Court mentioned in Gebhardt, just to complete that thought, it held that the statutory bar would likely include constitutional claims. It was clear enough, but it then assumed that it did not, and then reached the merits of the claim. Well, because you cite Gebhardt, but in support of your contention, that the standards by which the Secretary reaches its TPS decision is unreviewable under Section 1254A. But Gebhardt involved a jurisdictional provision that expressly granted the agency, quote, sole and unreviewable discretion, unquote, which doesn't seem to exist here. So in light of the history and purpose of the TPS statute, which was enacted to place limits on executive discretion in this realm, why should we find Gebhardt persuasive? Well, Your Honor, I just want to take a step back. If we're talking about whether Gebhardt bars the statutory claim, and I think one thing we can agree on is even if there isn't a clear statement of barring the constitutional claim and it doesn't meet that standard, that it does cover the APA claim and that... That's one thing. Well, that's one thing where we're... Who is we agreeing on that? The government. The government. Just to be clear, though, that the reason it wouldn't cover the constitutional claim is because there's no clear statement that it bars constitutional claims. But it would bar the APA claim and that's separate from that. Well, let's talk about that. What about McNary and Catholic Social Services? And those are the cases that go to that point, right? Right. Because your opposing counsel does not agree with that, so... Right. Can you engage with that? Yes. Well, as this Court has stated several times, that a challenge fits within the McNary line of cases if it's a genuinely collateral challenge. And what this Court has said is if... You can't just invoke a procedure or a policy or a practice. That's not enough. If the procedure or policy is inextricably intertwined with the substantive determination, if you're challenging the procedure just to get to a reversal of the underlying substantive determination, those claims are barred by the judicial review bar. And I think Gebhardt, which, again, it had some of the language that Judge Callahan mentioned, but the Court held that a McNary-like claim could have existed there if... And I think the key there is, one thing they said is, two of the claims there were, A, the Secretary has adopted too high a standard and we can't meet it and it's an improper standard. And secondly, that that standard should have been adopted through notice and comment rulemaking, a procedural challenge. That's entirely different than what they're arguing here, really, just so that we can engage on what they're really contending. What they're contending here is not about the level of sort of the standard, but that there was a change in the practice and that that has not been sufficiently explained. And they say that over and over again. Could you respond to that, please? Sure. I mean, in Gebhardt, the claim was that this change in policy should have gone through notice and comment rulemaking. I mean, that's essentially the same, that it should have been better explained, that it should have gone through comment. And this Court said, no, that's barred. And what's clear from the case law is, if you're challenging the reasons a Secretary gave or the explanation that someone gave for a decision, and this is in the Proyecto San Pablo case where they said the reasons given were pretextual or it was inadequately explained, that is a challenge to the substance of the underlying determination. That's why in California Trout, for example, they were attacking the substance of determination and saying it was inadequately explained. You didn't explain your change in policy, therefore the determination itself is arbitrary and capricious. And that's what they're getting at here. They're trying, and the only relief they seek, I think this is indicative here of that as well, the only relief they seek is a reversal of the underlying termination decision. They're not seeking a, you know, they don't mention anywhere in their complaint, or at least in their relief portion of their complaint, that they're seeking. So I want to ask about McNary and these cases generally. I couldn't find a case where an APA challenge alleging arbitrary and capricious action by the government has ever been found to be collateral in any context. Is the government's position that if it's an arbitrary or capricious claim under the plaintiff could make an arbitrary or capricious claim that would be collateral and therefore reviewable? No. It's the government's position, and the DC Circuit said this expressly in the Amgen case, that if there's a bar on the determination, you can't challenge it on the ground that determination was arbitrary, capricious, or reached in a decision. Is there any case that's gone contrary to that, because I haven't found one. Not that I know of, Your Honor. I'm not aware of any case in which a court has held that an arbitrary and capricious challenge would survive the same bar. Can I ask about the administrative record? I'm deeply troubled by what the district court did here. Part of it is I had a hard time recreating what happened with the administrative record. As I understand it, the government came in with an administrative record. What happened then? The district court started ordering all kinds of discovery, but he never seemed to find an ultimate administrative record under which this was reviewed. So, what happened? Your Honor, I agree that we think what happened in the district court was improper. The government, the plaintiffs asked for discovery on these claims, and the government opposed that on the grounds that review under the APA and review of agency action is limited to the administrative record, which we produced, and the district court simply in an order without explaining why discovery was appropriate. That's one of the questions I have. Did the district court ever make an Overton Park finding here? I couldn't find it. He did not, Your Honor, and that is one- Why isn't that error in and of itself that we have to vacate this injunction? Well, that's certainly an error with respect to ordering discovery and in relying on any extra record. Well, okay, but then let's go to what the district court relied on because 95% of what the district court relied on in his review of the APA were documents that were outside of the administrative record. Yeah, Your Honor, I agree. That is a grounds to reverse on. On the APA claim. Now, I had thought that an Equal Protection Clause claim, it's different. You could go beyond the administrative record. However, after ACLU filed their 28J letter, it prompted me to think there's no difference. Actually, I think the Supreme Court, as I read it in the Department of Commerce versus New York case, they seem to agree with that, that the district court in that case erred by ordering discovery even where constitutional claims were at issue without making an Overton Park finding. Your Honor, I agree with that and the court did make expressly clear that in challenges to agency actions, including constitutional challenge, that they should be limited to the administrative record and that discovery is appropriate only in extraordinary circumstances and only in the narrow case where there was a finding of bad faith and there was no such finding here. And moreover, as Your Honor pointed out, the Department of Commerce case, it didn't involve an equal protection challenge, but it did involve a constitutional challenge. Was there a dispute here about whether the entire administrative record had been produced? I mean, the plaintiffs did allege that it was not, but to the extent that the district court ordered beyond, and again, plaintiffs have received extensive discovery, including... Is it best showing that the district court ordered anything beyond the Administrative Record Council? There's an order, which we cite in our brief, in which the court allows, and he allowed depositions and he allowed, he overruled... I've read the order. I'm just trying to figure out what your position is on the extent to which it exceeded. I think, I take it your position is that it exceeded the scope of what you would say is fairly characterized as administrative record. I'm aware that there was a dispute about whether the entire administrative record had been produced. So, where do you think it went too far? Well, certainly when we got into the point of, well, A, ordering deliberative materials, although we agreed to allow those to go into the administrative record. There's a recent case in the D.C. Circuit, which I don't have, but typically deliberative materials aren't covered, but those were covered, but then certainly going beyond that. Hold on, hold on. I just want to be clear. It's an important case. Did you agree to admit those materials? Some of the deliberative materials, but not all of them. Okay. Into the administrative record or just produced? Into the administrative record, but we did not agree that, for example, the deposition of a political appointee from the last administration should be part of the administrative record. We have a place, I don't want to take a ton of time on this, but I think it is an important point. Do we have a place where we can look sort of most concisely in the record to figure out the scope of what was permitted and where the government would object? Your Honor, in our discovery briefing, we laid out what we thought should cover, and there are docket numbers in the district court, and that's what we thought should be included. Thank you. Counsel, I know you've reserved time for rebuttal, and you might want to address this question on rebuttal. As I look through this, the district court made so many errors, violated the law in so many ways. Is there a point at which we say on remand to the district court, if we vacate this injunction, we think this should be sent to a different district court judge because there were so many errors that occurred here that we don't think justice warrants sending it back to the same district court judge? I mean, Your Honor, we haven't asked for that relief. Obviously, this court has the discretion. Could we do that sui sponte? Your Honor, I'm not familiar with the law in that area well enough to say. You're not asking for that right now, are you? We are not asking for that right now. Are you familiar with that standard? I assume it's a very high standard. Right. Okay. So, I'm going to ask another question, and I'll give you your rebuttal time, so, I mean, we have some flexibility here, but let's assume, and when I say assume, it's the panel hasn't discussed this, so I'm asking on a hypothetical. Let's assume that we agree with you that the plaintiff's APA claim is barred from judicial review. Wouldn't you still need to show that the district court abused its discretion regarding the equal protection claim in order for us to vacate the preliminary injunction? Yes, that's correct, that you would have to find... I mean, I know that you're arguing that, you know, Gebhardt sweeps the whole, it's a tsunami and sweeps the whole thing away. But if we didn't agree, I'm just kind of, I'm trying to look at different avenues and giving you hypotheticals about if this, then that. So if, but, and I'm not saying we haven't reached any decision, but assuming we said the APA claim is barred, we still would have to look at the equal protection claim, right? If you found that it wasn't barred, yes, you would have to... So given the deferential standard of review by which we are bound here on the, and probably in the Ninth Circuit, it's a little more, it's a little more deferential because we have what Alliance Rockies or Rock, what, I might be transposing that. Why should we conclude the district court abused its discretion in concluding that the plaintiff's raised at least serious questions on the merits of equal protection? Yes, you're right. First, I'd like to start with the decision itself. First, these were decisions that were based on a careful assessment of the country conditions. And we know that because the secretaries actually extended TPS for four countries, including two African countries at the same time they were terminating. So it was clear they were basing it on the conditions in the country itself. They also, there's no evidence in the record, despite the extensive discovery that the district court allowed, that plaintiffs can point to that shows that, and I think this is undisputed, that either of the secretaries themselves harbored any discriminatory animus. The decision itself was consistent with the standards that past secretaries have applied. And I think it's also consistent with common sense that Congress here created a temporary program based on temporary and extraordinary conditions. That it would make sense that, you know, those conditions don't exist 20 years later. Okay. I understand all of that. But let's just look at that. Let's look at the factors. I'm understanding you to concede that the appellee plaintiffs, you're saying that on their favor. Right. Well, doesn't the government have any harm here? Or do you just, are you basically just conceding that point? I'm just making the argument, you know, I'm trying to understand this. If the Constitution provides that the executive branch can exercise certain powers without review, isn't the government harmed when a court interferes with that? Well, certainly, yes, the government is harmed any time a court bars it from taking an action within its authority to act. But I realize the government doesn't have a face, and the hundreds of thousands of people that are under TPS have faces. But so is it still your position that there's the government, it tips in favor of the recipients? Well, Your Honor, I mean, we... You conceded the point, I think, in your... Yeah, and we do not argue on appeal that the harm, we do not argue about harm on appeal. Okay, so what about the serious questions? Yes, we do disagree with that. And as I was saying, these were rational decisions. And in order to get to a discriminatory finding here, the district court and the plaintiffs are asking this court to pile inference upon inference. There's no direct evidence that these individuals... There's no direct evidence of a serious question? That's correct, that there is no serious question raised. There's two ways that you could look at something, and there's some evidence, wouldn't, then do they... No, I mean, and I would point this court, we didn't cite this case, but there's a case Pimentel v. Dreyfus from 2012 at this court. And that was a case in which the state of Washington ended a food stamps program for certain aliens. And like here, the district court entered an injunction based on the constitutional claims and found that there were the harms from being denied this program tipped in favor of the plaintiffs who were aliens. But on appeal, this court... The government didn't challenge that finding, and this appeal court accepted it, but yet it found that their constitutional claims did not raise serious questions. And they were similar to the claims that they raise here. And we think the evidence here is just insufficient. And I would ask, what could the secretaries in this area do under plaintiff's theory to circumvent an equal protection challenge? Okay, thank you. I have not yet... Go ahead. Thank you, Judge Callahan. If we decide that the APA claim is reviewable, I have two questions, and I want to make sure you have an opportunity to respond to them, please. I think the government argues that there's been no change in past practice, right? That's correct. You just contend that that fundamental premise that the plaintiffs are arguing is incorrect? So I want to give you an opportunity to respond to this statement that's quoted by the district court attributed to Acting Secretary Duke, that this would be a strong break with past practice. What is your response, please? Yes, thanks. If you read that passage in the record, you'll see that what she's referring to is a break from the practice of routinely or automatically granting these without taking a close look at the actual conditions. And so that's what she's doing here, and that's what most past secretaries have done. And is that... Was that document that was just referenced, is that part of the administrative record even as amended? I do not believe it is. There was an email between her and... I have one more question, please. And that is a response to a question posed by Senator Feinstein at a Senate Judiciary Committee hearing. She asked, can you tell us... This is a question posed to Secretary Nielsen, and it's cited repeatedly in the record, so you're very familiar with it. Can you tell us some of the arguments made in the TPS designations and why those were not persuasive? And Secretary Nielsen responded, we did not talk generally about the country conditions, and I want to be very clear on this, the law does not allow me to look at country conditions... Excuse me. At the conditions of a country, writ large, it requires me to look very specifically at whether the country conditions originating from the original designations continue to exist. So I have two questions there, and I want to give you a chance to respond. I think you argue a couple of things in your briefing. You seem to argue there wasn't a change, a period, they didn't change in practice. And then in other places in your briefing, I think your argument is a little different, and it is that the consideration of surrounding circumstances are baked into the Secretary's decisions here. And I want to be clear that I'm understanding you. I just want to be clear about what the practice has always been, and that is that you are focused on the originating conditions and whether they continue to exist. But if there was an intervening event that, for example, made recovery from those conditions difficult or impeded recovery or that sort of thing, such that those conditions still exist, then you consider that. And the Secretary has considered those intervening events to the extent that they impacted the conditions that... The original. The original conditions. So it's not an ignoring the intervening conditions altogether. And so that's why it's consistent with what Secretary Nielsen said, that the ultimate focus, which is consistent with the statute, it makes perfect sense, I think, that you first place. I don't think their argument is about the statute. I think their argument is about the practice, how that's been implemented, you know, of course, by several administrations, the Bush administration, the Obama administration. They go back several administrations. And I... But I think you've answered my question, which is, if I can paraphrase, and then I'll stop, I promise, then I think it is that the original country conditions were what was examined, and your position is that that is consistent with the statute. And... But other changes and conditions that bore on the original originating reasons for designating the TPS are also considered, and were also considered. Is that right? That's right. And that's apparent, not only in these termination decisions, but look at the extension decisions that were reached by these same secretaries, and they specifically mentioned, you know, new conflict patterns, et cetera, et cetera. So clearly, in the fact that they're considering current conditions, by definition incorporates you know, intervening events that would have altered those current conditions. So... Thank you, counsel. Thank you, Judge Kavanaugh. Thank you. All right. I'll give you some time for rebuttal, but I'll decide after we hear from the other side what time we need for rebuttal. But thank you. Good morning. Good morning, Your Honor. Ahilan Arulananam for the plaintiffs. Before I get into the rest of it, I just want to particularly answer Judge Nelson's question about whether strong break with past practice is in the record. It is. It's in the original record. It's on ER 632, which is the first page of the record for Nicaragua. I think that speaks to... Excuse me. Are you talking about strong break with past... Is this a quote from Acting Secretary Duke? Yes. Is that what you're speaking of? Correct, Your Honor. It is in the administrative record. Okay. It's in the original administrative record, because there's an email exchange, which is in the original administrative record. Okay. Thank you. But can I... Can I bring... I wanted to walk through the administrative record, because as you pointed out in your work, unanimously, the Supreme Court unanimously found that the district court abused its discretion by not making an Overton Park finding. Do you agree that the district court here did not make an Overton Park finding? No. No, that's not true, Your Honor. And I think... Where did the district court make an Overton Park finding? The difficulty here, Your Honor, the district court said at the very end of, I think it's Supplemental Excerpts 366, it's the last page of the motion to dismiss ruling, has a section on the discovery. And in that, it says, as discussed on the record, I'm ordering the government to respond to certain discovery. You have to look at the record to figure that out. And it's not even in the excerpts or anywhere, but it's on... I think it's ECF 39, but it's the argument that we had on the motion to dismiss, the last 25 pages of that argument, it's like page 75 to 100 of the transcript, is a discussion of all of this. I made an argument for why we're entitled to discovery under the Equal Protection Clause. I said, pretext claims and discrimination has obviously not been found by the agency. The government made some answers to that. He ruled in our favor on that question. Then on the particular discovery responses, you can see it's all discussed there. We argue a lot of this is information that should be included in the record. And the district court ultimately says, hey, you have to include deliberative information. Isn't there overlap between the discovery responses that you are making, RFP number one in particular, and what is information that should be considered pre-decisional, direct and indirect in the record? And the reason why we didn't brief this properly, and it doesn't end up... I apologize in a sense, but they don't argue... They never even put the district court order in their brief. They never said that this was the basis for their appeal. They don't give the reasons. They don't talk about what documents... They do argue that they're limited to the administrative record. And because I was actually along your lines until I went back and read their brief again, and they clearly make that argument. I don't know why they didn't make it more prominent in their briefing, because to me it's just absolutely clear. But anyway, I think you've answered my question, and I'll go look at that. I didn't see that, and I take it what you're saying is that you made an Overton Park argument to the district court, and you're assuming that because he ordered that discovery, that that also agreed with your arguments on the Overton Park analysis. But do you agree the district court didn't cite Overton Park? No, district court didn't cite any... It just ordered this as discussed on the record. But that seems... I mean, Overton Park says you have to make a strong showing of bad faith or improper behavior, not allegations. And it seems to me that the district court needs to make a finding in the record of a strong showing of bad faith, and I don't see that done here. I see the district court very back of the hand saying, hey, I'm going to give you all this discovery. But it's deeply troubling. I mean, you understand why this is troubling. In an APA case, we are limited to reviewing what the agency does. This is not a summary judgment motion where everything in the record comes in and you can consider everything. A few thoughts on that, Your Honor. First, even they argued actually at the PI hearing that on equal protection, the court should look at the full record. That's in supplemental excerpt page 7. They argued that below. Yeah, they argued that below. So they said, look at the full record. They said, look at Ambassador Neelan's testimony as a way of understanding Secretary Duke's comments on this subject, right? Second, they conceded in that same transcript, which I hope you'll read, they said, yes, as to RFP number one, which is a lot of the documents that we're talking about here, maybe some of that information is deliberative. Maybe it should be included. And then the litigation fight and the subsequent orders are about deliberative process privilege. Are there other cases where courts have looked to deliberative materials in reviewing an APA claim? It just seems so contrary to administrative lottomy. Center for Biological Diversity, I think, is the case that I remember citing in the district court. But it's true, Your Honor. This is not well briefed. I think the main thing I would say on this subject is, if the court has concerns about the equities, and the court also has concerns that there's a lot of legal error here, but it's unclear which documents it affects. It's a complex record. It's a big record. And a lot of the documents that we would rely on are in the administrative record. Well, let me walk through that, because I'm not sure it is that complex. This is what the district court relied on, testimony of Leon Rodriguez. Is that in the administrative record? No, that's the one. What about the Deagle Declaration? Is that in the administrative record? That's just a collection of exhibits, Your Honor. The Dagan Declaration is a collection of a bunch of exhibits. Are any of those in the administrative record? Yes, many of them are, Your Honor. Many of them are. So, for example, the email that we're talking about is one of them that's in the administrative record. In addition, Your Honor, the government says, well, we rely a lot on the decision memos. We say the decision memos contain this phrase, there are many problems in Haiti, but they're not directly tied to the originating conditions. That word appears in El Salvador, that same phrase appears in El Salvador, it appears in Haiti. That decision memo is in the administrative record for each country, those decision memos are. But you would agree that the district court looked to evidence in making its, in imposing its injunction that are outside of the administrative record. It looked to Rodriguez, Your Honor. That's clearly, the Rodriguez Declaration is clearly outside of the administrative record. And why isn't that grounds for reversing this and sending it back? On the APA claim. And perhaps even the Equal Protection Clause claim. Well, I think you can affirm based on the evidence that's clearly in the administrative record. If you go through the process of, you know, determining which ones are and are not, it's going to be complicated because the government doesn't say which documents are and are not. So you're saying we can find that the district court erred, but our review of what's actually in the administrative record still supports the injunction. Yes, Your Honor. And I would say it's not just the administrative record. Even they concede on the APA claim, it's the administrative record and official pronouncements. That's the word from American Wild Horse Preservation. They cite that. What's an official pronouncement? Well, I would, I would argue, Your Honor, Judge Christin, you had mentioned testimony to Congress where they say things like, the law does not allow me to look at the country conditions of a country writ large. That's one of the things Nielsen said. But was that testimony to Congress made before this decision was made or after? That one is after. But how can that be part of the administrative record? That's something that the agency reviewed in making its decision. Well, the Kelly testimony, the Secretary Kelly's testimony is before. So that, that one is the earthquake was why TPS was granted. That's how I have to look at it. Right. That's before. And you can go through this process and, and, and parse, perhaps that's what you're, you know. Well, I think it's important. And, and I don't think that just because there's a strong equities here, that that's grounds for running roughshod through the APA and, and review of the administrative record. And apparently I'm not out to lunch on that because a unanimous Supreme Court just said you can't do that. Yes. Your Honor. I, I don't read Department of Commerce's overturning Overton Park, obviously it's just an application of Overton Park. Yeah. So, so I think whether the information particular documents are, you know, fall within that or not, I'd say is, you know, they, they didn't, other than the Rodriguez declaration, I don't know what document they would contend is not within the deliberative materials that are legitimately accepted as part of this administrative record. And it feels like- That's something we need briefing on, counsel. It is a, it is a threshold question for us. And there was a dispute. It was hotly disputed by my read of the record about sort of what should or should not be included, whether discovery was going to be allowed and to what extent. And I appreciated opposing counsel's comments that helped fill that out for me, you know, somewhat, including that the government conceded and, and agreed to some of these materials being included. But I don't know, following up on Judge Nelson's question, I haven't been able to find a concise statement of what the government continues to contest. So is, is that, do we have that in here? It is nowhere. They don't, other than the Rodriguez declaration, they don't go through document by document. Is there some reason we couldn't require that when you say we could go through, my vote is that you go through. Is there some reason that we shouldn't order counsel as a, as a threshold to get our arms around that? What's fairly consistent? Sure, Your Honor. What is, what are you, what is the government objecting to? Yes, Your Honor. I think if, if the court, I mean, I think the simplest path to affirmance here, which I'll get to in a minute is, you know, equities plus equal protection, but leaving that aside, if the court is inclined to address the APA, it, I think would definitely be appropriate if you don't find it was, I mean, I would have thought that if you're appealing a decision, you just cite the decision below, cite the legal standards, cite the documents that you say you're opposing. I mean, that's what happened in. Well, they do have a throwaway line. It's not, it's not well-developed. Judge Nelson, I think, has acknowledged it's not well-developed, but it's in there. Okay. And on the APA claim, if we decide that the cart is before the horse, is there any reason, it sounds like, if we decide that, your, your, your response to my question is that you agree with opposing counsel. We don't have one concise statement of what's admittedly in the record, where you both agree? We agree, Your Honor, and we would be happy, if that's the court's pleasure, to brief both the question whether, I would, I would put it as two. One is, which of these documents should be admitted under Overton Park? And then second, what is left of our claim? You know, if you, let's say that the Rodriguez Declaration doesn't come in under the APA claim for Overton Park, which I think is a fair point, then what is left on which you would make the new rule claim? You know, our view is, the testimony, the FRNs themselves, the, the register notices, are actually all you would need to make it. If you look at excerpts, page 70 to 76, that's the motion to dismiss order. The district court does a side-by-side comparison of all these different factors, and that, I think, actually, that's enough to make it, certainly to establish a serious question on it. You probably didn't think you'd spend 11 minutes on this today, did you? We have more questions. Excellent, Your Honor. So, that's the, so, if, all right, do you agree that Section 1254A's bar of judicial review over specific TPS determinations logically means that this court generally cannot inquire into the underline, underlying analysis or reasoning employed by the agency in reaching TPS decisions? No, Your Honor. And let me just say two things about this. First, it sounds like the court is already, perhaps, leading this way, but, you know, this would be the first case, on the constitutional claim. Well, we're not leading. We're asking questions. Okay, very good, Your Honor. We're, we're trying to, Okay. Investigate paths. So, let's separate the constitutional claim and the APA claim, right? Right. And the constitutional claim, this would be the first decision ever in the Ninth Circuit and ever in the Supreme Court to find a constitutional claim foreclosed, even in the channeling provisions, not barring, just channeling provisions of 1252, the INA's jurisdictional section, So, you agree that it's different. They mention constitutional claims. Yes. I mean, that the court, I asked, you know, opposing counsel about if I, if, assuming that I feel that it is not justiciable, that that would take care of the APA claim, but that it wouldn't take care of the Equal Protection Claim is what you're saying. I agree the analysis for the two is different, and we have never argued that the Equal Protection Claim is collateral. I've never actually thought about it. One way or the other. Well, see, that's, that's where I'm struggling with this, because the collateral aspect comes into this, and everybody cites it as the rule, but I think you're right that the Equal Protection Clause is not collateral. However, I also tend to agree that the Equal Protection Clause is reviewable, and so I'm, I'm sort of confused as to how that plays. It's just that there's two different interpretive canons that are operating in this jurisdiction stripping doctrine. You know, one is that collateral claims are generally thought to be outside, and then a separate one is that constitutional claims, to foreclose those, you have to write it clear as a bell, and they've never found a statute clear enough, so it's just two completely distinct issues. Now, on the collateral for the APA claim, Your Honor, I agree with Judge Nelson's reading as well. Other than Gephardt, other than Gephardt, they do not cite a case where there's an entirely foreclosed, the court finds an APA claim that's just like a process claim about unexplained departure or notice and comment, entirely foreclosed. They channel them. There's a bunch of cases about channeling them, but here the government's arguing no court, nobody will be able to raise this in a removal proceeding ever again, gone, right? Gephardt does foreclose a notice and comment claim, but as Judge Callahan, as you were saying, it repeatedly, in that section of the opinion on the statutory claims, it points to that sole and unreviewable discretion, sole and unreviewable discretion. That's the language that they hook to, that this court hooks to, to find that even process-based claims are barred. So that language is not here, and that's the end of the story. That's why both the claims are reviewable. It's actually entirely straightforward. Now, as to the equal protection merits, well, hang on. I have a question about that. So let's just assume, let's just assume that, you know, for purposes of this argument, that the APA's gone and we're focusing on the equal protection. What record evidence, if any, demonstrates the link between the alleged racial animus espoused by the President and the Secretary's TPS determination decisions? It seems to me the record is fairly thin on that. Two sets of evidence, Your Honor. And let me underscore here, right, the clear error, these are now factual findings outside the administrative record that we're reviewing. Wait. I can't tell whether, and you're talking a little bit fast. Sorry, Your Honor. I can't say, I can't understand if you said these are now factual findings or not. These are now. We're talking now about factual findings that are reviewed outside of the administrative record. Yes. Thank you, Your Honor. If you could slow down just a little bit. Sure. We're now talking about factual findings that we're reviewing outside the administrative record on the findings that the agency never made and they're reviewable for clear error. So Cooper v. Harris, which is the Supreme Court's decision from two years ago about clear error is really important here. We are not asking this Court to find that the Secretary acted out of animus. We're asking, or even that the President did, we're saying that reasonable people can differ on this subject. That's the finding. That's a serious question issue, right? No, Your Honor. It's actually about the clear error standard. The premise of clear error review is that there might be two reasonable readings of the evidence. Their reading might even be more plausible. That's what the Supreme Court says. The question is, is the district court's reading also plausible? Could reasonable people like the Anti-Defamation League reading this record? What if there's legal error in there? The district court relied on the cat's paw theory, which has been applied in employment context. It seems quite a stretch. I couldn't find any case where that's been applied to the President of the United States. It seems a little bit disingenuous to extend it that way so casually. We disagree on that, Your Honor. Is there a case, because I had that same question, that supports extending the cat's paw theory of liability to national security slash immigration cases? I couldn't find a case either, Counsel. Is the proposition we're talking about, just to be clear, the case I thought we were looking for is a case where we're looking for the proposition that the cabinet members respond and carry out the President's policies. There aren't- Is that the proposition? I think the proposition is, does the normal equal protection rule that you can impute the animus-based motives of one actor to an ultimate decision-maker, does that apply in this context? You're not talking about the America First. You're talking about the statements made by the President. Yes. I think that the best evidence that we have on whether or not- this is going back to Judge Callahan's question. I think the best evidence on that question is the state of mind statements from the Secretary. There's several of them. I'm doing this as a result of an America First view of the TPS decisions. TPS in general must come to a close- And you think that shows animus? That's consistent with- no, no. Our argument is that shows that the President's pressure is influencing the decision-maker. Shocking. It's the government. I mean, is there ever a decision? As part of the problem I had with sort of the brief and with the district courts- by the way, your brief was excellent. I mean, very well done. But one of the problems I had with it is it sort of reads as if there's in a vacuum where we're not looking at how government actually operates. We always have the President or the administration influencing these decisions. That's why the cat's paw theory seems to me to be just off point. But, Your Honor, I- What's remarkable about cabinet members doing what the President wants done, that's the idea. Right. So, two thoughts. Why do we even rely on or look to cat's paw? Right. So, two thoughts, Your Honor. Arlington Heights- cat's paw is just a species of the way Arlington Heights analysis happens. Arlington Heights applies to legislatures. It applies to initiatives where the people vote on it. It applies to city councils and to all kinds of government, right? And in those situations, the court is often imputing the animus-based motivation of supporters of that initiative, of people who worked on the legislation to the decision-maker- We appreciate that, counsel, but this is very different because why do we need to look to that theory for the notion that the cabinet member- it seems to be a job description to carry forth the President's policies. Well, I think you can imagine two different worlds. One world is, as Your Honor said, of course the secretaries have to be influenced by the President in an intensive way. If that's true, then when the President is expressing animus and tying that animus to particular decisions, even, which is what happens here, then the Fifth Amendment's going to operate. I'm sorry, Your Honor. Go ahead. No, no, finish. I didn't mean that. Well, I think the other theory, which sometimes is operating, is that secretaries, particularly in a situation like this where the statute delegates a decision to the secretary, the statutory and administrative scheme contemplates. That's sort of what they're asking. Like, put your blinders on and see that. But you can't have it both ways, right? If you accept, yes, the President is, of course, influencing this decision, well then the President's potential animus is relevant to a Fifth Amendment analysis of this otherwise- Okay, let me ask you about that because there's this assumption that the President has animus, and I think Judge Callahan started to touch on this, but if you go read the President's to do with the TPS statute that we're reviewing. And the one that does have something to do with the TPS statute was made after this decision was already made. Right. So two points, Your Honor. First, this is where a clear error really comes in because many people do not read it that way. Many people do not. And I think it's very- I am very sensitive to that. I understand that there's a lot of views out there, but we are an Article III court and you're asking us to make a determination that the President, as a legal matter, has animus. Isn't that- We're not. We're reviewing a decision made by a district court. Yes, Your Honor. And so exactly what are you asking us to review, please? We're asking you to find that the district court's reading, and there's a number of factual statements from, I think it's page 27 to 30 in that neighborhood, and also the irregular sequence of events as well, which he describes in very much detail, that those, as he raises serious questions as to whether animus is motivating this decision, is that finding one that reasonable people can disagree on? That's the question, right? Let me just say one last thing. I realize I'm- You might make a very different finding were we in the trial court. That's your premise. Absolutely, Your Honor. Absolutely. Let me just say one last thing about the timing, because obviously that is the piece of evidence which is directly about the TPS decision making, Your Honor. That statement comes three days after the termination decision for El Salvador, and just a few weeks after, one right after the other, Haiti, Nicaragua, and El Salvador have happened, right? And then there's, in response to that, a set of senators, including Republican senators, come and offer a proposal to grant permanent residency to the TPS holders who have now just lost these 400,000 people, or 300 at that point, who have lost their immigration status. It's response to that proposal, that we give permanent residence to these people, that the president makes these statements, why can't we have more people from countries like Norway? Why do we have people from ISIL countries coming here? So the timing actually is, I think, quite probative. It's after, but it's almost like contemporaneous state of mind evidence, because it's three days after. It's right after this thing has been put in place. The White House had held a meeting just a few weeks before that, which said, NTPS for all the countries. That's what had happened. Now, some people may read that- Let me ask you something about, when you're talking about things that are after, in your 28J letter to the court, you cited an Eastern District of New York case, Saget versus Trump, as providing, quote unquote, new evidence in support of your claims in this case. So coming along the lines of things that we've discussed, I'm wondering, under what case or legal authority, if any, may we look at the factual record in another case in resolving the questions pertaining to your claims here? You can't, Your Honor. The reason why we say that is to say, we're going to go back to the district court, either with an injunction placed or not. And the only question we're here to discuss is whether the terminations are going to go into effect for the 10 months or however long it'll take for this case to be tried, or whether instead it'll continue in effect, right? When we go back to the district court, Your Honor, we will put in that evidence. We'll put in the evidence from Saget, we'll actually literally put it into our record. Question about that. Okay, whether, let's, just if we're playing the assumption game, and I know we're taking you into overtime, but we're going to, it will be relatively even at the end of all this, because we want to have all our questions answered from both of you and give that perspective. But let's take another hypothetical that the court reverses and there's not an injunction in place. You go back to the district court, you're going forward. What is the, but there are other cases throughout the country, and you cited the one in the to the circuit there. Is there, is there still, even if we vacate our, this injunction, is there still an injunction in place that would present, prevent the administration from moving forward on these individuals? Not except for Haiti, Your Honor. So we're the only case that actually has all the countries, these four countries. And actually there's a follow-on case we brought, which has the other two countries, Honduras and Nepal, which under agreement we made with the government is tied to this one. That's the only, this is the only injunction that covers all of them. There's one injunction on Haiti. There's another case, which is at, I believe, pending decision, or maybe it's at summary judgment. I can't remember, which I believe is Honduras and El Salvador, but they're all piecemeal. And so there is no way to protect all of the people in this case. And again, Your Honor, if there are legal errors here, you can correct them, right? You don't, you don't have to later, this case will come back, right? But there will be a trial or a summary judgment, and this case will come back. And it's perfectly- To that point, the district, forgive me for interrupting, but, right, the district court's order contemplates an expedited trial schedule, and then of course that's where our record ends pretty much. So what's the status in the district court? Do you have a trial date? Where are you? No, Your Honor. The government, you know, wanted to stay the case for this appeal. And so then we entered into a discussion about that. And basically, you know, the district court order did not, clearly did not foreclose a new termination decision. You can see that at page 12 of the order. We said, okay, we'll stay, we'll agree to a stay if you agree not to, you know, issue a new decision. And there was a lot of other things involved in that order as well. But as a result, the proceedings are stayed pending this appeal. But if this court resolved this appeal and, you know, went back, the case could proceed to trial. And I just want to reiterate, I just want to reiterate what I was suggesting earlier, Your Honor. The court could keep the injunction in place because it finds serious questions on either of these to, while still either suggesting or ruling that there are various problems with the district court's ruling, it could limit the review of the record, which is similar to what happened in Regents. And it could do all of those things while still permitting the injunction to go in place. Otherwise, you know, 300,000, 400,000 people will lose their employment authorization, their right to work. Some of them will be deported. And then at the end of the trial, if it flips out and it turns out that actually we were right, then you'll have to somehow unwind this and the jobs will be lost and the homes and all these things. There's a real logic to keeping the injunction in place, even if the court has serious questions about whether later, when we come back on appeal, the court would actually affirm it. Can I ask one final question? And I think your points are well taken on that. Is there any case that's actually upheld an equal protection clause argument against agency action? I know Arlington Heights gives us the standard, but, but you've got, you got the Trump versus Hawaii rejected, Department of Commerce versus New York, the district court rejected it. It didn't even go up to the, you know, you know, on appeal. We, we do have Regents, which apparently does, and the Supreme Court just accepted cert. I feel like we're being asked to fall into a trap here and I don't, I mean, how often do we need to get reversed by the Supreme Court before we say, Hey, you know what? These equal protection clause claims are a little specious. So, so three thoughts on that, your honor, if you'll, if you'll indulge me, you know, first Trump v. Hawaii does not hold substantively that race discrimination is permissible in this context at all, right? I mean, no, I give you that. My question is simply, is there a case, we've got a lot of cases about what the standards are. Is there a case that actually holds that an equal protection clause claim is, or grants an equal protection clause claim on the merits in, in these circumstances? I mean, I'm not, I haven't thought about the question in that way. You know, I, I, I could, I mean, I'm thinking like, you know, gender discrimination claims in the immigration context, some of which have gone well, I believe when, but I'm, I'm going to be wrong. And I don't want to speculate in response to your question, you know, but, but I would say no one has ever said that the norm doesn't operate here. Right. And no, I understand what the standards are. I just want to know if there's a case that we can rely on, because it seems like every time a court sticks their neck out, they get reversed. Well, so this court is bound by regions, obviously at the moment. And you know, we'll see what the Supreme court does with the equal protection claim there, but that's obviously when I would point to the census case, the district court order, which the government cites. If you look, it survives the motion to dismiss, equal protection does, it's not dismissed. It survives the motion to dismiss actually. Then it goes, I mean, this is actually worth the, the, the order explaining why they at bench trial rule against the equal protection claim in the census case is really interesting because the court says there was a lot of other evidence here. The key evidence was the secretary's state of mind, but you weren't allowed to take the deposition of the secretary. And so I find you don't have enough evidence of state of mind. You know, I feel bad, but that's, that's the ruling here. We have evidence of the secretary's state of mind. It's in this email exchange and these other documents that we're talking about. Right. In addition, the state of mind on animus, you have it on state of mind of what the law is. And that's the problem. Yeah. The only evidence of the secretary's animus that the district court referred to was ordering the employees, people working for her to look for evidence on crime and public benefits information as to Haiti. And the district court did find that that they've been trying to cover that up. And there's an email exchange about that. They also found that that they were then trying to concoct an explanation for why they had done it. That's the only evidence though, you know, on that subject, the date back to then secretary Kelly. Yeah. That's secretary Kelly has to Haiti, your honor. The first Haiti, the first Haiti decision, right? So you were using a female pronoun, which is confusing me. Is it? I don't think that was acting secretary. I'm sorry. I'm, I'm, I must've misspoke your honor. That's secretary Kelly. Just, I just want to keep the chronology. Sorry. Yes, your honor. So, um, do, is that conclude question? I'm going to give you two minutes to wrap up. And then I'm going to give the government five minutes on rebuttal, which will give you the relatively equal time as far as that goes. Thank you, your honor. So, uh, we've spent a lot of time talking about the state of mind of the secretary and the nature of these statements from the president. And I would just point the court. There's another set of findings at the end about the irregular sequence of the, uh, of the decisions here. Um, much of that is information that's from the administrative record, but it's being used for equal protection one way or the other, and there's an email where, um, and this is pre-decisional material actually where, um, uh, Francis Cisna says, uh, this Sudan decision reads like, uh, one person wanted to extend a TPS and then someone came and clubbed them over the head. Um, it's highly irregular similarly with Haiti, um, uh, and I'm actually with all of them, you know, there's quite a strong evidence of irregular decision-making if you compare this to other cases. And I take the court's point that, um, this feels like it feels as though something more should be required, uh, under Arlington Heights here than in other contexts. I, I'm not sure that I, um, accept the premise of that, but, but, uh, even so, if you compare our facts on the facts of other cases, routinely without any direct state of mind evidence of the decision maker, courts have found, uh, evidence of racial animus just based on a massive unexplained change in behavior. Like why did we grant all the zoning permits normally, but then we would deny this one, which appears to be the same. Couple the statements by expressing animus from supporters or, you know, other people who are only tangentially involved in the decision is often inferred. Uh, so the court could, I think rightly, uh, uh, not rightly, excuse me, the court could, if your honors are so inclined, criticize the district court's treatment of some of the evidence in this, in this case, uh, but still find that there's enough other evidence here to establish a serious question. And if there's a serious question on just whether reasonable people could disagree about how to read this record, you know, look at the Anti-Defamation League's brief is, has a very different view than other people do. Um, and I share their view about how to read this record and how to read those statements. That would be a basis to affirm the injunction now. And then, you know, maybe I'll be happy to come back to your honors maybe in 10 months or something. And then, uh, you know, the, the court could look at all this after we have the full record and all the information, uh, properly before the court. So you will see us soon anyway, probably. I'd be happy to, your honor. Thank you. All right. I'm going to give the government five minutes for rebuttal. Uh, thank you, your honor. And there are just a few points, uh, four points that I wanted to make in rebuttal. First, um, I would point this court to the Department of Commerce case, which has come up a couple of times. The Supreme Court made clear in that case that certain factors like, uh, the fact that you're carrying out a presidential policy or the fact that you're taking political considerations and making a decision, the fact that you're disagreeing with staff, that all of these factors are just a routine part of agency decision-making and are an evidence that a decision is arbitrary and capricious, let alone that it's motivated by discriminatory animus. Um, secondly, I would also, in a similar vein, point this court to Hawaii versus Trump, which, which this court is very well aware of. In that case, there were statements, some of the same statements that plaintiffs rely on here. They were, but there, they were made by the actual decision maker. They were directly about the decision and the Supreme Court said that's not enough to state a constitutional claim in that context. Was it important that some of those statements, many of them were made while, um, President Trump was a candidate, but really before he was a president? Well, I mean, I mean, certainly that's, that is important and I think it's particularly inappropriate to rely on them at that point because he then subsequently takes the oath of office to uphold the constitution and so forth. Um, so, but, but even the post-presidential statements, it's still inappropriate, um, to, uh, draw the kind of inferences that plaintiffs are asking you to draw here and then, and then not only draw that inference, but then draw the inference that anyone who works at the White House shared all of those views and then the inference that the secretaries were motivated by those views and so forth. There's no cause for that. Um, how much difference do we have to review the record? I guess, I guess this really would be under an abuse of discretion standard. Uh, there, there's a lot of evidence of this record that shows we have hard working career and political officials that were trying to get this right. They weren't just out there. If you read the administrative record, they weren't just out there trying to deny this at all costs. In fact, there's some suggestions that they were trying to make accommodation to go to Do you know anything about that congressional relief they were trying to, to, to get? Your Honor, I don't, and it's not in the record. I know that was part, it's in the record that they suggested that they would, right. But I guess as I read that, I'm thinking, wait a second, we're relying on the district courts relying on all these broad statements by the president that have virtually nothing to do with TPS. And when you look at what the staff on the ground, including high level White House officials were saying, there's not an inkling of animus it to the contrary, they're actually trying to do the right thing here and recognize that this is a complicated, uh, and, and deeply affecting a decision. And how much discretion do we have to review that? And I think the answer is just if it's abuse of discretion from the district court on that. Yes. I mean, first of all, we, I fully agree in there's additional evidence. The fact that they extended TPS for four other countries when the conditions warranted that they really were thinking hard about this and trying to get these right. Opposing, opposing counsel does mention, since you mentioned the four countries, their briefing says that 95% of the people who were, had received TPS, um, have had that terminated. Do you contest that? I don't contest those figures. I would say that, for example, El Salvador accounts for, I think, 65% of, of, of these. And that was a country that was detonated almost 20 years ago. So the fact that conditions would have changed. I'm just trying to get my arms around the, when you mentioned the four countries. Right. And some of those countries have more people than some of the countries that were terminated and so forth. So I don't know that there's any significance there. My question that I asked of, um, counsel for the appellee, uh, plaintiffs, um, if, if the court were to, uh, assuming once again, we're always dealing with hypotheticals, if the and lift the preliminary injunction, would there, would, would, I mean, you know, what would happen immediately? Is there anything else that, uh, protects any of these people? Why the cases are pending? Um, well, first of all, there is an injunction in Saget for Haiti, um, and then the parties have agreed. But it's a different, it's a smaller, kind of the Venn diagram, isn't it? Where it's, uh, not all the people. That's right. I mean, there are other district courts who could potentially rule as well, but even in these cases, though, the parties have agreed that the termination decisions won't go into effect for, I believe it's 120 days after the mandate issues from this court. Um, so, you know, there would at least be that period, point of time, four months or, or so after the mandate issues, um, in which the protections would still be in place. Um, and I want to talk just briefly, because I know the administrative record has come up quite a bit in this case, and I, and I should have thought harder about this, but we produced in the excerpts of record, those are the administrative records that we agreed to ultimately. So that those materials in, in those excerpts are what we agreed to. Now we disagreed. Nothing more. I mean, that's nothing more. That's what we, that's the universe. Now we don't, we argued vociferously that you shouldn't include deliberative materials. That's improper and so forth. The district court overruled that objection and we included those materials, but, uh, on the more general point, you know, I think plaintiffs agree that the Rodriguez declaration shouldn't have been included. And that was a key piece of evidence that the district court relied on. They also have a lot of media reports and things like that. Wait, I just wanted to get back to your, you say that everything that you've put in the supplemental excerpts of record before this court is part of the administrative record? Well, everything that's designated as administrative record. Oh, that's right. Okay. Yeah. Yeah. Is it different for the APA claim and the equal protection claim or is, is it just one body? Your Honor, because the equal protection claim arises under the APA, then it is limited to the administrative record. And now I also want to say just to the point, that the administrative, that an equal protection, a constitutional claim to an, of an agency action is covered by our position, it's covered by the APA. So therefore it's subject to the APA's limitations on a record review. And that's what the Supreme Court effectively held in Department of Commerce as well. And I just want to also be clear that when we talk about official pronouncements in what you can look at, what we're talking about there is the long history of federal register notices that secretaries have issued over the, over many years, termination decisions, extension decisions, and what, and, and those are official announcements of the reasons the secretaries were giving for, for ending TPS or extending it. And that's all this court needs to review to understand what the policy was and that's what types of information has been reviewed in other cases. If you get to the merits, now the claim is barred, so you shouldn't get to the merits, but if you get to the merits, that's all this court needs to look at to, to learn what the policy is and to understand that there was no change. All right. Do either of my colleagues have any additional questions? No. But thank you to both parties. I mean, you've done a great job. Yes. Thank you to both parties. Excellent arguments. This matter will stand submitted. The court's going to be in a brief recess and we'll come out and hear our last case for argument after that. Thank you, everyone. All rise.
judges: Callahan, Christen, Nelson